**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES L. TURNER,
           *Plaintiff-Appellant,*

v.

COMMISSIONER OF SOCIAL SECURITY,
           *Defendant-Appellee.*

No. 09-35080

D.C. No.
6:07-cv-06158-HO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Submitted February 1, 2010*
Seattle, Washington

Filed August 2, 2010

Before: Pamela Ann Rymer, Ronald M. Gould and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Gould

---

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

11075

**COUNSEL**

Alan Stuart Graf, Alan Stuart Graf, PC, Summertown, Tennessee, for the appellant.

Willy M. Le, Social Security Administration Office of the General Counsel, Assistant Regional Counsel, Seattle, Washington, for the appellee.

**OPINION**

BYBEE, Circuit Judge:

James Turner appeals the district court's grant of summary judgment in favor of the Commissioner of Social Security upholding a denial of Disability Insurance Benefits under Title II of the Social Security Act. Turner contends that the Administrative Law Judge ("ALJ") did not give sufficient weight to the opinion of one of his doctors, improperly discredited his own testimony, and failed to adequately address his Veteran Affairs ("VA") disability rating. Because substantial evidence supports the ALJ's decision and the ALJ committed no legal error, we affirm.

I

Turner suffers from post-traumatic stress disorder. In 2002, he filed an application for Title II disability insurance bene-

fits, 42 U.S.C. §§ 416(i), 423(d), claiming that he was unable to work on July 3, 1990, due to gunshot wounds, chronic back pain, and post-traumatic stress disorder. Both parties agree that Turner must show that he was disabled on or before December 31, 1990, in order to qualify for benefits under Title II of the Social Security Act.

A

In 1990, Turner was forty-four years old. During his service in the Army, he sustained gunshot and shrapnel wounds in Vietnam to his left arm, temple, foot, and leg. Between 1985 to 1992, Turner underwent several medical examinations through the VA. In 1985, Dr. Heide, a psychiatrist, examined Turner and diagnosed him with probable post-traumatic stress disorder. According to Dr. Heide, Turner avoided the subject of Vietnam, expressed that he felt paranoia in crowds, and stated that he was easily startled by loud noises, but denied feeling depressed, sad, or hopeless. Dr. Heide reported that Turner was pleasant and cooperative and opined that Turner's functional ability was fair. In 1986, Dr. Aflatooni, a psychiatrist, examined Turner and diagnosed him with post-traumatic stress disorder and atypical depression. Turner reported that he experienced nightmares and flashbacks about Vietnam. He stated that he was depressed, angry, forgetful, and uncertain about the future. Dr. Aflatooni reported that Turner was cooperative and pleasant, showed no anxiety or irritability, made eye contact, and was fairly well oriented to time, place, and person.

In 1990, Dr. Koogler, also with the VA, administered a psychiatric examination to Turner. During the examination, Turner reported that he had daily thoughts about Vietnam and some flashbacks triggered by helicopters, but reported no nightmares. Turner explained that he had difficulty concentrating, did not read, avoided crowds, slept sporadically, and disliked unexpected noises. He expressed paranoia about the government and losing his compensation. Dr. Koogler

observed that Turner was oriented, had a normal intellect, and displayed good judgment. At the end of the report, Dr. Koogler included a "summary," in which he stated that Turner was disabled from a back injury and suffered from post-traumatic stress disorder and depression. Dr. Koogler noted that Turner had maintained himself "without severe problems with his [post-traumatic stress disorder] by isolating himself from society and living out in the country."

In 1992, two years after the time relevant for Turner's disability determination, Dr. Koogler examined Turner again and noted that there had been no change in Turner's mental status since their last meeting. Dr. Koogler observed that Turner "continue[d] to have a severe back problem[ ] and hobbles in and out of his chair . . . ." Dr. Koogler noted that Turner had not received treatment, but that he was in "good spirits and fe[lt] like his anger [wa]s controlled because he [wa]s left alone." Later that year, John McFarland, a social worker, examined Turner. McFarland noted that Turner chose to live an isolated life, trading his labor on a ranch for lodging. McFarland noted:

> The veteran was somewhat guarded during this interview. He states he feels that one result of this interview would be that his compensation would be cut off. . . . Regarding employability, the veteran is doing just about all that he can do presently. He would not be able to tolerate any employment which required any sort of structure, answering to bosses, or dealing with people.

Turner received VA disability ratings in 1987, 1997, and 2002. In 1987, the VA assigned a post-traumatic stress disorder disability rating of thirty percent. This rating indicated "occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation

normal).” In 1997, the VA maintained the thirty percent rating. In 2002, the VA raised Turner's post-traumatic stress disability rating to 100 percent and made it retroactive to the year 1997.

B

In 2002, Turner filed with the Social Security Administration for disability benefits due to his gunshot wounds, chronic back pain, and post-traumatic stress disorder. At his hearings,[1] Turner testified that he was disabled due to back pain and post-traumatic stress disorder. He stated that he could only walk a half mile at a time, sit fifteen to twenty minutes at a time, and lift up to forty pounds. Turner testified that he "had no mental problems" but that he did not trust anybody and liked to be alone. He stated that he took Motrin for his back pain, tried to avoid doctors, and obtained treatment only when the VA called to see him. During a regular day, Turner performed various household chores and work on the ranch, including feeding cattle, fixing holes in fences, and assisting in rounding and branding cattle.

At Turner's second hearing, a medical expert, Dr. Crossen, who had not personally examined Turner, but who had reviewed his medical records and prior hearing transcripts, confirmed that Turner had post-traumatic stress disorder and depression. Dr. Crossen pointed to the fact that during the time that Turner claimed to be unable to work, he successfully

---

[1]The Commissioner denied his original application, and Turner requested a hearing. After a hearing in 2004, an ALJ determined that Turner was not disabled within the meaning of the Social Security Act. The Appeals Council denied Turner's request for review, and Turner challenged the Commissioner's determination in federal court. The parties agreed to remand Turner's case because the ALJ failed to consider Turner's VA disability rating. The district court granted the parties' stipulated motion to remand Turner's case for a new hearing. Turner's testimony from both hearings was consolidated for purposes of his second disability determination, the determination currently on appeal.

lived by himself, responsibly cared for a ranch, and formed a relationship that led to marriage. Dr. Crossen observed that the record contained "little evidence" that Turner was completely incapacitated besides Turner's own subjective complaints.

Using the required five-step sequential framework for determining whether a claimant is disabled, *see* 20 C.F.R. § 404.1520, the ALJ determined that Turner had not engaged in substantial gainful activity since his alleged onset date, that Turner had a severe impairment (namely, post-traumatic stress disorder), and that the impairment did not meet or equal the requirements of any listed impairment that would demonstrate presumptive disability under 20 C.F.R. pt. 404, subpt. P, app.1. The ALJ then found that Turner had the residual functional capacity to work at any exertion level, but that he would be limited to simple, repetitive tasks, require an environment without a lot of background activity, not be able to perform work involving public contact, and work best alone. Using this residual functional capacity, a vocational expert testified that an individual with Turner's experience and background could find jobs such as a cleaner, laundry sorter, or folding machine operator in the national economy. Because Turner could perform some jobs in the national economy, the ALJ determined that Turner was not disabled under the Social Security Act. The Commissioner affirmed the ALJ's decision, and the district court granted summary judgment in favor of the Commissioner. Turner timely appealed.

## II

On appeal, Turner alleges that he is disabled solely due to his post-traumatic stress disorder; he does not challenge the ALJ's rejection of his physical disability complaints. Turner argues that the ALJ erred in determining his functional capacity in three ways: (1) by not giving sufficient weight to Dr. Koogler's 1990 examination; (2) by rejecting Turner's subjec-

tive complaints; (3) by inadequately addressing the disability findings of the VA. We examine each in turn.[2]

A

**[1]** Turner first argues that the ALJ improperly rejected the medical findings of his treating doctor, Dr. Koogler. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. . . . [T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. . . . [T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons . . . ." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) (quotation marks omitted). Turner argues that Dr. Crossen's opinion contradicted Dr. Koogler's report. It is not clear, however, that Dr. Koogler actually concluded that Turner was disabled from post-traumatic stress disorder, nor is it clear that Dr. Crossen or the ALJ actually rejected Dr. Koogler's report. What Dr. Koogler said, in the briefest of summaries, was that Turner was "disabled from a back injury he sustained in 1980." But the back injury is not the basis for Turner's claim; he alleges that he is disabled because of his post-traumatic stress disorder. But with respect to post-traumatic stress disorder, Dr. Koogler concluded only that "[t]he veteran has been able to maintain himself without severe problems with his [post-traumatic stress disorder] by isolating himself from society and living out in the country." At Turner's hearing, Dr. Crossen agreed that Turner had post-traumatic stress disorder, was easily distracted, and had a startle response. Even with

---

[2]We must affirm the Commissioner's final decision to deny benefits if the decision is supported by substantial evidence and applies correct legal standards. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).

these limitations, Dr. Crossen could not find that the "little evidence" in the record supported Turner's claim that he was disabled. Dr. Crossen testified that Dr. Koogler's report did not establish that Turner was disabled. Dr. Crossen stated, "I think Dr. [Koogler's] assessment and reasoning there is reasonable, but as far as any evidence or anything that would actually confirm that [Turner could not work], I don't see anything there. . . . There's nothing there to say that he can't do . . . more than what he was doing." The ALJ agreed that Koogler's report "d[id] not necessarily imply that the claimant is incapacitated" by his post-traumatic stress disorder. As the ALJ found, nothing in Dr. Koogler's report "assign[ed] any specific limitations on the claimant" or stated that Turner was unable to work with "little interpersonal interaction." Even if Dr. Crossen's testimony did not contradict Dr. Koogler's report, the ALJ did not need to provide "clear and convincing reasons" for rejecting Dr. Koogler's report because the ALJ did not reject any of Dr. Koogler's conclusions. The ALJ incorporated Dr. Koogler's observations into Turner's residual functional capacity.

**[2]** To the extent that Dr. Koogler's evaluation could be read to suggest that Turner was disabled and could not work, the ALJ gave "specific and legitimate reasons," *Lester*, 81 F.3d at 830-31, for rejecting that implication in favor of Dr. Crossen's testimony that the record did not support Turner's claim. The ALJ noted that Dr. Koogler's opinion was "based almost entirely on the claimant's self-reporting." Most of Dr. Koogler's evaluation recorded Turner's report of his sleeping patterns, anger, or startled responses, without any independent analysis or diagnosis. In fact, Dr. Koogler assumed from the outset, without offering his own diagnosis, that Turner suffered from post-traumatic stress disorder. Other than observing that Turner had a "startle response" when a telephone rang, Dr. Koogler made no attempt to cite "objective findings to substantiate" a claim that Turner would be unable to do simple, repetitive tasks without a lot of background activity and with no public contact. In addition, because Dr. Koogler

had "not had any previous interaction with the claimant," the ALJ found that Koogler "was in a poor position to assess the claimant's statements." The ALJ concluded that Dr. Koogler's report did "little to assist the claimant in establishing that he is disabled for Social Security purposes." On this record, the ALJ reasonably rejected Dr. Koogler's evaluation to the extent that it implied that Turner could not perform simple, repetitive tasks in an environment without public contact or background activity.

Although the ALJ rejected any implication in Dr. Koogler's evaluation that Turner was disabled, he did incorporate Dr. Koogler's observations into his residual functional capacity determination. The ALJ took into account Turner's "marked limitations in social functioning" by "limiting [him] to work in which there is no public contact, and where it is recognized that he works best alone." The ALJ observed that Turner could "not . . . perform complex work," but should be "limited to simple and routine work." In particular, "[h]is hypervigilance and startle reflex . . . limit[ ] him to work without significant background activity." These limitations were entirely consistent with Dr. Koogler's limitation.

**[3]** Turner also argues that John McFarland's 1992 report supports his claim that the ALJ improperly discredited Dr. Koogler's evaluation. McFarland concluded that Turner "would not be able to tolerate any employment which required any sort of structure, answering to bosses, or dealing with people." Although we explained why Dr. Koogler's evaluation does not conclude that Turner was disabled, we also think McFarland's report does not establish that Turner was incapacitated. First, as a social worker, McFarland is not considered an "acceptable medical source[ ]" under the regulations. 20 C.F.R. § 404.1513(a), (d). The regulations treat "[p]ublic and private social welfare agency personnel" as "other sources," 20 C.F.R. § 404.1513(d)(3), and the ALJ may expressly disregard lay testimony if the ALJ "gives reasons germane to each witness for doing so." *Lewis v. Apfel*,

236 F.3d 503, 511 (9th Cir. 2001). Here, the ALJ's determination that Dr. Koogler's examination was the only examination during the "actual period at issue, between the alleged onset date of July 3, 1990, and the date last insured of December 31, 1990" was a germane reason for not addressing McFarland's 1992 opinion that Turner was unable to work with structure or answer to bosses. Second, McFarland gave no support for his broad claim that Turner could not work. McFarland wrote that Turner had nightmares, that he did not like crowds, and that he felt "on guard at night" because he feared intruders. But none of these factors support McFarland's opinion that Turner "would not be able to tolerate any employment." On the contrary, McFarland's evaluation revealed confidence in Turner's ability to function on the ranch and noted that Turner did "quite a lot of work around the ranch" and obtained supplies from the town every two weeks. Third, McFarland is the only person who opined that Turner was completely unable to work and he did so outside the relevant time period. Although the VA doctors who interviewed Turner concluded that he suffered from post-traumatic stress disorder, none of the doctors indicated that Turner was unable to work because of this diagnosis. The ALJ did not err in disregarding McFarland's report.

[4] In sum, there is no evidence in the record from an appropriate medical source during the relevant time period that refutes the ALJ's determination that Turner, even with post-traumatic stress disorder, was capable of performing simple, repetitive tasks in an environment where he could work alone and without public contact.

B

[5] Turner next argues that the ALJ improperly rejected his alleged mental complaints, particularly his need to be isolated from other people.[3] But Turner never claimed that he was

---

[3]In order for the ALJ to find Turner's testimony unreliable, the ALJ must make "a credibility determination with findings sufficiently specific

incapacitated by his need to be alone. He testified at his hearing that he did not have friends, avoided everybody, and did not "put up" with "most people." Sensitive to Turner's complaints, the ALJ determined that Turner would work best alone and could not work with the public. The vocational expert took these limitations into account when she testified about the kinds of jobs available to Turner in the national economy.

[6] Moreover, the ALJ provided several cogent reasons for rejecting Turner's claim that he could not "put up" with "most people" and his suggestion that this limitation left him unable to work. The ALJ noted that Drs. Heide and Aflatooni both found him to be cooperative and pleasant. Turner told Dr. Koogler that he had been able to develop control over his anger. In addition, the ALJ stated that Turner's "residence on the ranch . . . reflects the confidence that others have in him to perform tasks" and that he adequately dealt with people when he went into town to obtain supplies or to the VA for examinations. The ALJ also noted that Turner was capable of developing a personal relationship during this time that resulted in marriage. Although Turner preferred to isolate himself, the ALJ did not improperly discredit Turner's subjective complaints.

[7] The ALJ also found that Turner was not entirely credible because he had made exaggerated statements about the intensity and persistence of his physical impairments. During his hearings and on his disability application, Turner stated that his back pain limited his ability to stand, sit, and walk,

_____

to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). In weighing a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid, . . . and . . . the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

but then described that his work on the ranch involved building fences, running a tractor, feeding cattle, and laying irrigation waterlines. Because of this discrepancy in his testimony, the ALJ found that Turner could not be "found to be wholly credible regarding any allegation of total disability." The ALJ properly rejected Turner's implication that he was disabled because he could not "put up" with most people.

C

**[8]** Finally, Turner argues that the ALJ did not give proper weight to Turner's VA disability rating. Because social security disability and VA disability programs "serve the same governmental purpose—providing benefits to those unable to work because of a serious disability," the ALJ must give "great weight to a VA determination of disability." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). An ALJ, however, "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.*

**[9]** Here, the ALJ did not fail to give Turner's VA disability rating proper weight. At the time relevant to Turner's claim, the VA had given Turner a thirty percent disability rating. According to the VA, a disability rating of thirty percent

> is granted whenever there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal) . . . .

Turner's residual functional capacity reflected a similar degree of impairment, stating that he could only perform simple, repetitive tasks, without a lot of background activity, and could have no contact with the public. The ALJ concluded, "[t]he claimant's primary issue, post-traumatic stress disorder,

is not shown to have been disabling in the period through 1990. This is reflected in the VA's refusal to find it more than 30% disabling at the time.["4] In sum, the ALJ did not reject the VA's partial disability finding for the relevant period, but incorporated that finding into Turner's overall residual functional capacity.

## III

Because the ALJ did not err in determining Turner's residual functional capacity, Dr. Koogler's report did not establish that Turner was unable to work, the ALJ offered specific, cogent reasons for rejecting Turner's subjective assessment of his inability to work, and the ALJ gave proper weight to the VA disability rating, we affirm the judgment of the district court.

AFFIRMED.

GOULD, Circuit Judge, dissenting:

Nobody disputes the Department of Veterans Affairs' ("VA") assessment, nor is it directly at issue, that as of 1997 Turner has been completely disabled by PTSD. And nobody disputes the ALJ's correct conclusion that Turner was severely impaired by PTSD on or before his date last insured ("DLI"), December 31, 1990. The only issue in this appeal is whether Turner's severe PTSD-related impairments became disabling, as that term is understood in the context of eligibility for social security disability insurance benefits, before December 31, 1990. If so, Turner is entitled to disability insurance benefits. The ALJ erred in deciding this issue by not giving clear and convincing reasons for rejecting Dr.

---

[4]The VA did not find Turner 100 percent disabled until 2002, retroactive to 1997, which is still seven years after the relevant disability period.

Koogler's uncontradicted PTSD opinion and by not considering evidence probative of the severity of Turner's debilitating PTSD. I would reverse and remand the matter for an award of benefits.

Turner's PTSD stems from trauma he endured while serving our country in Vietnam. Commentators recently described the features of the Vietnam War that increased the prevalence of PTSD among its returning veterans as follows:

> [T]he war presented the American military with a relatively new kind of warfare—guerrilla warfare. The very nature of guerrilla warfare expands the number of combatants placed in danger, encompassing both soldiers directly involved in the fighting and those working in what had traditionally been a relatively removed and safe logistical capacity. During the Vietnam War, there were no front and rear lines; the combat zone came to surround the soldiers virtually anywhere they were in that country at all times. Furthermore, because combatants are not clearly identified in this type of warfare, soldiers found it difficult to know who was friend or foe. For example, Vietnamese "civilians" could turn out to be Viet Cong operatives. Hence, many soldiers assumed a hypervigilant or "survivor mode" state of mind in which they attempted to be constantly aware of their surrounding environment in order to anticipate and react to potential attacks and life-threats. Unfortunately, many times this mode did not "turn off" when the soldiers returned home. As a result, many veterans manifested enduring psychological problems after returning to civilian life.

Thomas L. Hafemeister & Nicole A. Stockey, *Last Stand? The Criminal Responsibility of War Veterans Returning From Iraq and Afghanistan with Posttraumatic Stress Disorder*, 85 Ind. L.J. 87, 99-100 (2010) (footnotes omitted).

Turner's combat experience in Vietnam exposed him to terrible things that most civilians could never imagine. Turner's duties in Vietnam included, among other things, serving as a so-called tunnel rat. A tunnel rat's job was to descend into a Viet Cong tunnel—typically equipped with only a pistol, knife, and flashlight—and clear hostile forces from within the tunnel. *See* 1 *Encyclopedia of the Vietnam War: A Political, Social, and Military History* 141 (Spencer C. Tucker ed., 1998). Because of the "physically and psychologically draining" nature of this work, "most tunnel rats served relatively short periods." *Id.* Turner recalls two events in particular that still haunt him. First, Turner and his platoon discovered the remains of seven American soldiers who had been skinned alive a week earlier. Second, Turner watched a helicopter crash, killing all aboard, while Turner's own helicopter was taking fire. Also, Turner was not personally spared from the violence of the war. His military medical records show that he was hospitalized and underwent skin-graft surgery for missile and bullet wounds that he sustained during a firefight with hostile forces. It is beyond dispute that these experiences demonstrate Turner's "direct personal experience of an event that involves actual or threatened death or serious injury." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 463 (4th ed., text rev. 2000) ("DSM-IV-TR") (stating that this "essential feature" of PTSD may arise from military combat).[1]

---

[1]Given the gruesome shocks that follow in the train of war, it is not surprising that our young men and women returning from Vietnam have such a high incidence of PTSD. One congressional study concluded that 30.6% of male Vietnam veterans have PTSD at some point during their lives, and 15.2% of male veterans were still plagued by full-blown PTSD ten years after the Vietnam War ended. *See* Richard A. Kulka et al., *Trauma and the Vietnam War Generation: Report of Findings from the National Vietnam Veterans Readjustment Study* xxiii, xxvii (1990). Male veterans with high levels of war-zone exposure, as might be said about Turner, are still more likely to continue to suffer from full-blown PTSD. United States Department of Veterans Affairs, Findings from the National Vietnam Veterans' Readjustment Study, http://www.ptsd.va.gov/professional/pages/vietnam-vets-study.asp (last visited June 2, 2010) ("Those with high levels of war-zone exposure had significantly higher rates, with 35.8% of men and 17.5% of women meeting criteria for current PTSD.").

Dr. Koogler was an examining doctor for Turner. Prior to the DLI, Dr. Koogler described without equivocation that Turner employed in civilian life the isolating hypervigilance and distrustfulness that Turner and other soldiers relied on to survive in Vietnam, even though these trained responses are preventing Turner's successful reintegration into civilian life. Upon returning to his home after being gone for a period of time, Turner surveys his property for tire tracks and footprints, and checks his house thoroughly. Dr. Koogler also noted that Turner is "suspicious of anyone carrying a gun" because "he feels like they are a potential enemy, and this is particularly true of the police department." Turner thinks about Vietnam daily and the sound of a helicopter triggers flashbacks. This should be an obvious red flag for urban life where the sound of helicopter traffic is not uncommon. Turner became "involved as little as possible[ ] with people." It is within this context that Dr. Koogler diagnosed Turner with PTSD and opined that Turner "has been able to maintain himself without severe problems with his PTSD by isolating himself from society and living out in the country." The logical and necessary inference from Dr. Koogler's opinion is that Turner would not be able to maintain himself in an ordinary work environment where he must interact and coordinate with other people.

Because Dr. Koogler's opinion was uncontradicted, the ALJ erred by not providing clear and convincing reasons for rejecting Dr. Koogler's opinion. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) ("[T]he Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician."). The ALJ relied on Dr. Crossen's hearing testimony, stating, "As Dr. Crossen pointed out, Dr. Koogler's report does not necessarily imply that the claimant is incapacitated by PTSD." The ALJ misapprehended Dr. Crossen's view. Dr. Crossen concluded that Turner's impairments were "at least moderate and maybe severe." Dr. Crossen did not disagree with Dr. Koogler's opinion. Instead, Dr. Crossen stated, "I don't see any reason

to say [Dr. Koogler's] opinion is wrong, but on the other hand there's not a whole lot here to say that it's right except that, you know, it's just an opinion." Dr. Crossen's view, which at worst from Turner's perspective is equivocal, is not a clear and convincing reason to reject Dr. Koogler's explicit opinion that Turner's problems with severe PTSD can only be avoided by isolation. *See id.* at 831 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.").

The ALJ's incorrect conclusions that Dr. Koogler's opinion was based almost entirely on Turner's self-reports and that Dr. Koogler did not cite objective findings that support Turner's disability from PTSD similarly are not clear and convincing reasons for rejecting the opinion. Dr. Koogler noted many aspects of his assessment, not generated by Turner's own complaints, that led to his view of Turner's PTSD. For example, Dr. Koogler noted Turner's "severe startle response," that Turner "jumps clear out of his chair" when the phone rings in Dr. Koogler's office, that Turner "has severe difficulty concentrating," and that Turner "has an extreme restricted affect throughout the whole interview and does not display much in the way of emotion, except for a startle response with the unexpected noise." *See* DSM-IV-TR 464 (stating that PTSD's symptoms include "hypervigilance," "exaggerated startle response," "difficulty concentrating," "[d]iminished responsiveness," "persistent symptoms of anxiety," and "markedly reduced ability to feel emotions"). The ALJ ignored the value that these objective clinical findings have in supporting Dr. Koogler's conclusion that Turner requires rural isolation from society to cope with his severe PTSD. *See id.* (stating that those with PTSD "commonly make[ ] deliberate efforts . . . to avoid activities, situations, or people" that might trigger flashbacks or intrusive recollections of traumatic events). Instead, the ALJ, in determining Turner's residual functional capacity, cleared Turner "to perform work at any exertion level." Although the ALJ professed

to limit Turner to "simple and routine work" in an environment where there was not "a lot of background activity" and "no contact with the public," even these limitations do not account for Dr. Koogler's conclusion that Turner needs to be isolated from society and live out in the country just to maintain himself.

Moreover, it is not as if Turner's story of his PTSD is not supported by witnesses. To the contrary, and in a real sense, each day that Turner lives in an isolated area, bereft of the normal incidents of companionship that attend urban life and most jobs, stands as a silent confirming witness attesting to Turner's real difficulties. Why else would he live in the middle of nowhere? Why else would he be in large part a lone wolf, hypervigilant against imagined dangers?

The ALJ's erroneous conclusion that Turner's PTSD "is not shown to have been disabling in the period through [the DLI]" ignored not only Dr. Koogler's opinion but additional relevant evidence post-dating Turner's DLI that should have been considered. In 1992, within two years of the DLI, social worker John McFarland opined that Turner "would not be able to tolerate any employment which required any sort of structure, answering to bosses, or dealing with people" and, "[r]egarding employability, the veteran is doing just about all that he can do presently." The VA also determined that Turner was 100% disabled as of 1997. The ALJ did not consider this evidence. While the ALJ must consider only impairments (and limitations and restrictions therefrom) that Turner had prior to the DLI, evidence post-dating the DLI is probative of Turner's pre-DLI disability. *See Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition."). Because the ALJ recognized that Turner's "activities and reported symptoms ha[d] not really changed over the years," McFarland's assessment and the VA's subsequent 100% disability-rating were especially probative of the disabling nature of Turner's PTSD

before the DLI and therefore should have been considered by the ALJ.

In sum, Turner is the real deal—a decorated Vietnam veteran with two purple hearts who had a hard time of it over there, fighting an often unseen enemy, and who, back here, has a hard time of it getting his entitlement from the Social Security Administration. He has continuing problems that prevent him from engaging in substantial gainful employment. Yet the Social Security Administration is deaf and blind to this. Contrary to the ALJ's conclusion that Turner could work as a cleaner, laundry sorter, or folding-machine operator, Turner would be at risk of harming both himself and others if thrust from his beneficial isolation. Living apart in a rural area is a benignant circumstance for Turner. We cannot solve Turner's problems nor can we cure his PTSD. But the social security benefits to which Turner is entitled—and for which he applied almost eight years ago—might spell the difference between a life with some semblance of dignity and independence, and an alternative with inadequate funds to meet basic needs. I believe that these benefits are his entitlement, they are not an act of welfare, not an act of grace. They are merely and surely his due. I would therefore reverse and remand this case for an award of benefits. *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996) (reversing and remanding for an award of benefits where "a finding of disability is clearly required" and "[the claimant] has already waited over seven years . . . and additional proceedings would only delay her receipt of benefits").