**Tanya Ann HILLYGUS, Plaintiff,**

**v.**

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**4:15–cv–139 RP–HCA**

United States District Court, S.D. Iowa, Central Division.

Signed February 1, 2016

Gail Lynn Barnett, Schott Mauss & Associates, Des Moines, IA, for Plaintiff.

Mary C. Luxa, U.S. Attorney's Office, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Judge, UNITED STATES DISTRICT COURT

Plaintiff, Tanya Ann Hillygus, filed a Complaint in this Court on May 1, 2015, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

On April 11, 2012, Plaintiff filed an application for benefits. Tr. at 162–63. Plaintiff, whose date of birth is March 7, 1961 (Tr. at 162), was 52 years old (Tr. at 30) at the time of the hearing on October 3, 2013, before Administrative Law Judge Jo Ann L. Draper (ALJ). Tr. at 25–62.

The ALJ issued a Notice Of Decision—Unfavorable on December 6, 2013. Tr. at 8–19. The Appeals Council declined to review the ALJ's decision on March 18, 2015. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

At the first step of the sequential evaluation (20 C.F.R. § 404.1520(a)(4)), the ALJ found that Plaintiff has not engaged in substantial gainful activity after March 1, 2012, the alleged disability onset date. At the second step, the ALJ found Plaintiff has the following severe impairments: nerve impingement and status post pulateral pudenal nerve [1] decompression with fasclotomies of alcock canal and ascrospinous ligaments and placements of adhesion barrier. Tr. at 13. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 14. At the fourth step, that ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant is unable to engage in sitting for more than 10–15 minutes at a time throughout the day and spends the majority of her day walking or standing. In addition, the claimant is limited occasional climbing, balancing, stooping, kneeling, crouching or crawling; and is unable to work around hazardous conditions such as working around heights or moving machinery.

Tr. at 15. The ALJ found that Plaintiff is unable to perform any of her past relevant work. Tr. at 17. At the fifth step of the

---

1. pudendal nerve: branch of the sacral plexus formed by fibers from the ventral primary rami of the second, third, and fourth sacral spinal nerves; it exits the pelvis via the greater sciatic foramen, passes posterior to the sacrospinous ligament, and accompanies the internal pudendal artery, into the perineum via the lesser sciatic foramen; it gives off inferior rectal nerves, then courses through the pudendal canal in the lateral wall of the ischiorectal fossa, terminating as the dorsal nerve of the penis or of the clitoris. Stedmans Medical Dictionary.

sequential evaluation, the ALJ found that there is a significant number of jobs which Plaintiff can perform in her impaired condition. Examples of such work are unit clerk, routing clerk, and photocopy machine operator. Tr. at 18–19. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 19.

## MEDICAL EVIDENCE

On September 21, 2011, Plaintiff saw Charles H. Svenssen, M.D., at Penn Avenue OB/GYN. Plaintiff complained of low back pain which radiated to her pelvis, and up her left flank to the breast area. Plaintiff reported that her pain was worse on days when taking the maximum dosage of estrogen or progesterone. "Pain can be so severe, she cannot sit down." Tr. at 347. The doctor's assessment was lower back pain and symptomatic menopause. The doctor decreased the dosage of Plaintiff's medication by half. Tr. at 348.

On October 3, 2011 (Tr. at 329–31), October 6, 2011 (Tr. at 332–33), October 10, 2011 (Tr at 334–35), October 13, 2011 (Tr. at 336–37), and October 24, 2011 (Tr. at 338–39), Plaintiff was seen by Ole Olson, DC for chiropractic treatment for complaints of buttocks pain and low back pain.

On October 28, 2011, Plaintiff saw Andrzej Szezepanek, M.D. Plaintiff complained of left-side lower back/hip pain. The doctor wrote:

Her pain problems started spontaneously approximately 17 years ago. Her pain is progressively getting worse. The pain is located mostly over the left-sided sacroiliac region and intermittently radiates to the left groin and flank. The patient also reports intermittent radiation to the left axilla. It feels like an electric shock. Since July of this year, she is also complaining of pain located over the left lower buttock area. This pain goes around my leg and around to the front near the pubic bone.

Plaintiff described the pain as burning, stabbing, sharp, shooting, and penetrating. The pain was constant and was aggravated by sitting and relieved by standing. Plaintiff was not using any pain medication. She said that over the counter medication did not provide relief. Plaintiff also complained of depression and anxiety related to the chronic pain. Tr. at 353. After his examination, the doctor wrote that Plaintiff's chronic left-sided lower back, hip, and buttock pain appeared to be secondary to left sacroilliac joint syndrome and left ischial bursitis. The doctor wrote that the pain could also be related to possible left iliopsoas[2] syndrome. Plaintiff was given an injection which improved her pain. She was also given samples of Celebrex and Cymbalta. Tr. at 356.

On November 10, 2011, Plaintiff saw Lynne DeSotel, M.D. Plaintiff complained of tail bone pain when she sits. It was explained that Plaintiff had a hysterectomy in 2003, and she felt there was a lot of scar tissue because she had not felt right since the surgery. In July 2011 she had an onset of sharp pain in her buttock when she sat down. Plaintiff said the pain was very intense to the point that she needed "to stand to do her dictations instead of sitting like she is used to." Plaintiff said that she tried chiropractors, over the counter medication, injections and prescription medication, none of which provided her any lasting relief. She said the day before she had received treatment from a massage therapist and was able to sit without pain. Tr. at 382. The doctor recom-

2. a compound muscle consisting of the iliacus musculus and psoas major musculus inserting via a common tendon into the anterior surface of the lesser trochanter of the femur. *Stedmans Medical Dictionary.*

mended that Plaintiff continue to see the massage therapist. Tr. at 383.

On December 7, 2011, Plaintiff saw Dr. Svenssen. Plaintiff continued to complain of pelvic pain, and reported that it was sometimes so bad that she could not sit to type or do her work. The doctor ordered a lumbar/sacral MRI. Tr. at 346.

An MR scan of Plaintiff's lumbar spine dated December 13, 2011, showed no evidence of disc disease, nural foraminal narrowing or spinal canal stenosis. Tr. at 345, 361–63.

On December 20, 2011, Plaintiff underwent a left sacroiliac joint injection under fluoroscopic guidance administered by Dr. Szczepanek. Tr. at 357–59.

On December 23, 2011, Plaintiff underwent an ultrasound examination which was described by Charles M. Olson, M.D., as a "normal pelvic ultrasound, status post hysterectomy and oophorectomies." Tr. at 384.

On January 25, 2012, Plaintiff saw Sunny R. Kim, M.D., for an initial evaluation of left buttock pain. Plaintiff reported that her pain began in July 2011 after some yoga. Plaintiff reported that the pain interferes with her ability to sit for prolonged periods of time. She reported pain at level 7 to 10 on a ten point scale. The doctor wrote: "Her pain diagram is rather complex. She has some burning pain at the ischial tuberosity and proximal hamstring and left buttock. The pain occasionally wakes her up at night. It is worsened with prolonged sitting. Mobility has been severely impacted." The doctor's impression was that the pain was "most likely secondary to hamstring tendinopathy with partial avulsion tear." The doctor recommended an MRI of the pelvis to rule out avulsion tear of the hamstring tendon. Tr. at 386. The doctor gave Plaintiff topical compound pain cream to apply to her left buttock 3 times per day. Tr. at 387. The MRI did not show evidence of a hamstring tendon tear. It showed "Mild tendinosis/tendonitis of the gluteal insertions on the greater trochanters bilaterally." Tr. at 388.

On February 28, 2012, Plaintiff saw Stanley J. Antolak, Jr., M.D., at the Edina Medical Pain Clinic. Tr. at 389–93. Plaintiff complained of bilateral groin pain, pain in the pelvis, buttocks, and hips. Plaintiff reported that sitting had been painful for years, but that in July 2011, following yoga exercises, the pain became worse. The doctor wrote:

> The site of maximum pain is located in the groin and radiates to the right groin, left groin, and left buttock. . . . She describes the time course of pain as continuous but of variable intensity and the frequency of pain episodes as daily. She denies having any type of skin rash preceding the onset of pain. She rates the pain severity as 10/10 currently, 5/10 at best, 10/10 worst, 8/10 usually, 4/10 at rest, and 10/10 with activity. She describes the pain as aching, burning, electric shock-like, sharp, stabbing, throbbing, and shooting. Symptoms associated with pain include tingling, weakness, and sensitive skin. Factors that tend to increase pain include sitting, leaning forward, work activity, and emotional stress. Factors that tend to decrease pain include standing, walking, lying down, and sitting on toilet seat. Factors that seem to have minimal or no effect on pain include leaning back. Factors that have variable effect on pain include physical activity, urination, and sexual activity.

Tr. at 389–90. It was noted that Plaintiff was working from home as a medical transcriptionist. On review of systems, Plaintiff admitted weight loss, weakness, fatigue, general malaise, progressive neurological deficit in the legs, anxiety, depression, suicidal ideation, diffuse muscle

pain, swelling of multiple joints, diffuse muscle weakness, discoloration in area of pain, constipation, nausea, early menopause, being post menopausal, headaches, visual disturbance, lower extremity edema, palpitations, and irregular heart beat. On physical examination, Plaintiff appeared anxious, and her body habitus was described as frail. Tr. at 391. After the examination, the doctor wrote that Plaintiff has multiple abdominal wall pain generators that will affect the pudendal nerve, namely 1) Maigne Syndrome[3]; 2) abdominal cutaneous neuropathy bilaterally; and 3) llioinguinal/iliohypogastric neuropathies. Tr. at 393. Plaintiff was instructed to return to the clinic the next day for a pudendal nerve perineural injection. Tr. at 394. Dr. Antolak administered the injection on February 29, 2012. Tr. at 395–97.

On May 16, 2012, Plaintiff was admitted to a hospital for bilateral pudendal nerve decompression with transposition of the nerves and fasciotomies of sacrospinous ligament and Alcock canal. An adhesion barrier was placed. Plaintiff was discharged on May 18, 2012, with instructions to avoid sitting and driving for a month. Dr. Antolak wrote: "She may return to work when she feels comfortable." Tr. at 408.

On August 2, 2012, Plaintiff saw Dr. Antolak. Tr. at 448–50. Plaintiff reported that her pelvic pain was not bad until she had a bowel movement after which it felt like a golf ball in the left side of the natal cleft. Plaintiff reported sudden, intermittent burning in the suprapubic region and rectum. These symptoms appeared after the surgery. Tr. at 448. Plaintiff was given a prescription for Lyrica, and ad-

vised to consider acupuncture at the posterior tibial nerve. Tr. at 450.

On October 10, 2012, Plaintiff saw Dr. Antolak. Plaintiff's chief complaint was pelvic pain. She also complained of pain in the left buttock and low back pain. Plaintiff said that she does not sit because of pressure on the buttocks causes pain. It was noted that Plaintiff was working full time as a medical transcriptionist[4], and that she had no work restrictions. Tr. at 454. Plaintiff was advised to take Lyrica and to consider acupuncture at the posterior tibial nerve. Tr. at 456.

## ADMINISTRATIVE HEARING

Plaintiff appeared with counsel on October 3, 2013. Tr. at 25–62. Plaintiff testified that she had worked as a medical transcriptionist until 2011 when her employer "switched to a voice reconciliation system" and she was no longer needed. Thereafter, she worked from home for another company. Tr. at 32. When asked how her impairment interfered with her ability to do her work, Plaintiff testified that she obtained a cart on which to place her keyboard, and which allowed her to type from a standing position. Tr. at 33. The ALJ asked Plaintiff why she couldn't work at a job which required more standing than sitting. Plaintiff replied that she can stand, "[b]ut after an hour or two I need to lay down because it will pull, you know, on the nerves." Tr. at 35. Plaintiff said that cushions allow her to sit for five or ten minutes, after which she becomes numb. Tr. at 35–36. When asked about her ability to lift, Plaintiff testified that the heaviest thing she lifts is a gallon of milk. Tr. at 45. Plaintiff said she can walk

---

**3.** Also known as Thoracolumbar junction (TLJ) syndrome.

**4.** At the hearing, Plaintiff was asked about this statement. Plaintiff said she was un-

aware why the doctor thought she was working. Tr. at 34–35. As stated above, the ALJ found that Plaintiff had not engaged in substantial gainful activity after the alleged onset of disability date.

around in her yard, but walking longer distances aggravate her pain. Tr. at 48.

Plaintiff said she takes Amitriptyline and Tramadol. She cuts the pills in half because large doses cause her to be constipated. Tr. at 47.

When asked about daily activities, Plaintiff testified that she showers and walks around her house. She said she can do some laundry, but that her husband or son help her unload the machine. She said she uses a mechanical grabber to pick up things from the floor. Tr. at 49. Plaintiff said she can cook light meals, but that her husband or son must take things out of the oven for her. She said she can read and watch TV. Plaintiff testified that she is awakened by sharp pain. She said that if she is reading and begins to have sharp pain she just has to wait for it to pass. Tr. at 50. Plaintiff said that during the day, she can be up for a couple of hours after which she needs to lay down for a couple of hours.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 56. The ALJ asked:

Ms. Mitchell, could you please assume a hypothetical individual, this hypothetical individual is closely approaching advanced age with a high school education and has performed jobs in the past that are consistent with the jobs identified at 18E [Tr. at 321]. Now this first hypothetical individual is limited to lifting and carrying 20 pounds occasionally, 10 pounds frequently. Standing and walking anywhere from six to eight hours a day. This individual would probably not be sitting more than maybe 15—10–15 minutes at a time throughout the day. At least this first hypothetical—this first hypothetical individual is either walking or standing the majority of the day. Any sitting would be minimal. This hypothetical individual can only occasionally climb, balance, stoop, kneel,

crouch crawl, and this individual should have no exposure to hazardous conditions such as working around heights or moving machinery. Can hypothetical individual number one perform any work that's been performed within the last 15 years.

Tr. at 56–57. The vocational expert testified that past relevant work was not possible. The vocational expert testified that Plaintiff had obtained skills from her previous work including the use of computers and word processing equipment, and knowledge of medical terminology. Tr. at 57. Those skills would transfer to work as a unit clerk. The vocational expert also testified that the hypothetical restrictions would allow for unskilled jobs such as mail clerk, routing clerk, and photocopier machine operator. Tr. at 58. The vocational expert testified that if the hypothetical individual needed to lie down for four hours during a work day, that full-time competitive work would not be possible.

In response to a question from counsel, the vocational expert testified that if an individual were limited to lifting no more than ten pounds, with sitting limited to five minutes at a time, the previously cited jobs would not be possible. Tr. at 59. The vocational exert went on to testify that there would be very few job opportunities for such an individual. Tr. at 60.

### ADMINISTRATIVE DECISION

In the decision, the ALJ summarize Plaintiff's claims:

The claimant has alleged disability due to a nerve impingement which has been described as causing increased pain (Exhibit 6E, 2 [Tr. at 255]; Exhibit 10E, 1 [Tr. at 282] ). She has described the pain as constant and stated that she is able to achieve some relieve (sic) when laying on her back (Exhibit 7E, 2 [Tr. at 267] ). The pain radiates into her groin

which prevents her from sitting and the claimant has stated that she has not sat down in the year prior to August 2012 while also indicating that she is unable to stand for extended periods (Exhibit 7E, 2, 4 [Tr. at 267, 269]; Exhibit 10 E, 5 [Tr. at 286] ). With respect to activities of daily living, the claimant has stated that she can walk around her backyard but is unable to drive anywhere, has others drive her place, and she lays on her stomach in the backseat when riding in a car (Exhibit 7E, 3, 4 [Tr. at 286, 287]; Exhibit 10E, 4 [Tr. at 285]; Exhibit 13E, 4 [Tr. at 303] ). In order to address these various health issues, the claimant takes several medications including the following: Baclofen, cyclobenzaprine, diclofenac, Tramadol, and amitriptyline (Exhibit 2E, 4 [Tr. at ?][5]; Exhibit 10E, 3 [Tr. at 284]; Exhibit 17E, 1 [Tr. at 320] ). Side effects of these medications are described as including constipation (Exhibit 10E, 3 [Tr. at 284] ).

Tr. at 16.

The ALJ found that the medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible. *Id.*

The ALJ wrote that although Plaintiff described limited daily activities, two factors weigh against those limitations as evidence in favor of finding her disabled; First, limited activities of daily living cannot be objectively verified; and second, even if the activities are as limited at Plaintiff claimed, it is difficult to attribute that limitation to her medical condition "in view of the relatively weak medical evidence ..." *Id.* The ALJ noted that while

Plaintiff claimed to be unable to sit, she continued to work in a sedentary job which required constant sitting. The ALJ noted that the medical evidence did not support a finding that Plaintiff was unable to sit for a period of a year. *Id.*

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue,* 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart,* 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue,* 528 F.3d 1113, 1115 (8th Cir.2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola [v. Astrue],* 480 F.3d [885], at 886 [ (8th Cir.2007) ]). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005).

■ *Owen v. Astrue,* 551 F.3d 792, 798 (8th Cir.2008.) In *Brand v. Secretary of Dept. of Health, Education and Welfare,*

---

**5.** Exhibit 2E is a Report of SGA Determination—For SSA Use Only. There are 3 pages in the exhibit. Tr. at 236–38.

623 F.2d 523, 527 (8th Cir.1980), Chief Judge Lay wrote that *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review." In *Universal Camera,* the Court wrote:

We conclude, therefore, that the Administrative Procedure Act and the Taft–Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

■ *Id.,* 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987).

■ In short, a reviewing court should neither consider a claim de novo, nor abdi-cate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

The most important issue in any disability case which proceeds beyond step three of the sequential evaluation is that of residual functional capacity:

Probably the most important issue will be the question of [residual functional capacity].... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.

*McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc).

In her brief, Plaintiff raised four issues for appeal: 1) The ALJ failed to consider Plaintiff's combination of exertional and non-exertional impairments; 2) the ALJ's residual functional capacity is not supported by the medical evidence; 3) the ALJ failed to conduct a proper *Polaski* analysis; and 4) the ALJ erred in not providing controlling weight to the treating physicians' opinions.

In the case at bar, although the ALJ stated that the medical evidence was relatively weak, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. In *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984), the court wrote:

While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need

not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not support them.

The case goes on to state that while the absence of an objective medical basis is one factor to be considered:

The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness and side effects of medication

5. functional restrictions.

*Id.* Finally, the *Polaski* case states: "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.*

In support of her argument that the ALJ's credibility evaluation complies with *Polaski*, the Commissioner cites *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir.2012). In that case, the Court wrote that if a claimant presents objective medical evidence of an underlying impairment which could reasonably be expected to produce the alleged pain, and if there is no evidence of malingering, "then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." (internal quotations omitted). The Court went on:

For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; unexplained or inadequately explained failure to seek treatment or to follow a prescribed

course of treatment; and whether the claimant engages in daily activities inconsistent with the alleged symptoms. While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.

*Id.* at 1112–13. (internal quotations and citations omitted). The Court held that the ALJ's finding that Molina's testimony was not credible was supported by Molina's testimony regarding her daily activities, "including walking her two grandchildren to and from school, attending church, shopping, and taking walks." *Id.* at 1113. This testimony undermined Molina's claim that she was incapable of being around people without suffering from debilitating panic attacks. The Court also noted that these activities involved a degree of human interaction that was analogous to that required in Molina's past relevant work. *Id.*

In the case at bar, Plaintiff came forward with objective medical evidence of an impairment which the ALJ stated could reasonably be expected to cause the alleged symptoms. There is no evidence in this record that Plaintiff is malingering. Plaintiff's complaints of pain have been consistent throughout the medical record. There is no unexplained failure to seek or follow medical treatment—Plaintiff has sought out treatment from the most conservative to surgery, all in an attempt to alleviate her pain. There is no evidence in this record that her daily activities indicate the ability to function in competitive work.

■ Plaintiff has an excellent work history. Her earnings record shows uninterrupted earning from 1976 through 2012. *See* Tr. at 224–25. A claimant with a good work record is entitled to substantial credibility when claiming an inability to work

because of disability. *Nunn v. Heckler,* 732 F.2d 645, 648 (8th Cir.1984).

 Because the ALJ improperly failed to credit Plaintiff's testimony, the Court cannot find that the Commissioner's final decision is supported by substantial evidence on the record as a whole. The ALJ found that Plaintiff is unable to perform her past relevant work, and the vocational expert testified that no work exists for an individual who must lie down throughout the day because of pain. In *Beeler v. Bowen,* 833 F.2d 124, 128 (8th Cir.1987), the Court wrote:

> Because we find that the claimant's allegations of disabling pain were credible, and that substantial evidence on the rcord as a whole supports Ms. Beeler's claims of disability within the Social Security Act, a remand is unnecessary. *Talbott v. Bowen,* 821 F.2d 511, 515 (8th Cir.1987). "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

*See also Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987) ("where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand..").

### CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in *Gavin v. Heckler,* 811 F.2d at 1199, and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and is

based on legal error. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).[6] *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

6. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."